# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# ALEXANDRIA DIVISION

| | |
|---|---|
| B O M BANK | CASE NO. 1:25-CV-00321 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| BROOKE L. ROLLINS | MAGISTRATE JUDGE PEREZ-MONTES |

## MEMORANDUM RULING

Before the Court are two Motions for Summary Judgment [Doc. Nos. 24, 36]. The first Motion for Summary Judgment [Doc. No. 24] is filed by Plaintiff, BOM Bank ("BOM"). Defendant, Brooke L. Rollins, in her official capacity as Secretary of the United States Department of Agriculture ("USDA"), filed an Opposition [Doc. No. 35], and BOM filed a Reply [Doc. No. 38]. The second Motion for Summary Judgment [Doc. No. 36] is filed by USDA. BOM filed an Opposition to the Motion [Doc. No. 41], and USDA filed a Reply [Doc. No. 42].

For the reasons set forth below, USDA's Motion for Summary Judgment [Doc. No. 36] is **GRANTED** and BOM's Motion for Summary Judgment [Doc. No. 24] is **DENIED**.

### I.  FACTS AND BACKGROUND

This case involves the correct calculation of USDA's contractual liability to BOM for protective advances made by BOM under USDA's loan guarantee for a loan issued to Parc England Holding, LLC ("Parc England").

On December 20, 2012, pursuant to the Lender's Agreement between USDA and BOM, USDA issued a Loan Note Guarantee to BOM in connection with BOM's $4 million loan to Parc England ("the PE Loan"). The PE Loan was evidenced by a promissory note and secured by a mortgage on leasehold interests in a hotel and restaurant.[1] The PE Loan was guaranteed by USDA Rural Housing Services ("RHS") in accordance with the Rural Business Cooperative Service's Business and Industry Guaranteed Loan Program (the "Program").

On the same day that BOM made the PE Loan, BOM assigned its rights to the guaranteed portion of the PE Loan to six third-party holders (collectively, the "Holders").[2] BOM retained the rights and obligations relating to the preservation of the collateral, including the payment of "protective advances."[3]

In January of 2016, the PE Loan went into default.[4] Litigation ensued between BOM and a lessor who held title to the hotel and restaurant.[5] According to BOM, "the lessor who held title to the hotel and restaurant refused to return the property to commerce," which resulted in BOM paying the sum of $3,515,347.39 in protective advances until a settlement was reached in November 2022.[6] BOM alleges that USDA approved each protective advance before it was made.[7] However, USDA asserts that when approval was made as to each protective advance, USDA warned BOM that regardless of the amount BOM incurred in protective advances, the maximum loss to

---

[1] [Doc. No. 14-2]; [Doc. No. 14-3].
[2] [Doc. No. 14-6].
[3] [Id. at ¶¶ 3,4].
[4] [Doc. No. 14-1, p. 3].
[5] [Doc. No. 24-1, p. 5].
[6] [Id.].
[7] [Id.].

be paid by USDA could not exceed the regulatory limit on payable losses.[8] Thereafter, the property was liquidated, and BOM submitted its final loss claim to USDA for reimbursement of the guaranteed portion of protective advance.[9] Also, in early 2016, USDA purchased the guaranteed portion of the note from the Holders in the amount of $3,111,200.[10] BOM collected a total of $202,665.94 on the sale of the loan collateral, which was transferred to USDA, thus resulting in a net loss by USDA of $2,908,534.42.[11] These facts are undisputed.

The dispute, however, is calculating how much USDA is required to reimburse BOM. BOM argues that USDA is required to pay BOM eighty percent of the protective advances ($3,515,347.39), which would total $2,812,277.91.[12] On the contrary, USDA argues that pursuant to the applicable regulations and loan guarantee documents, it is only required to pay up to the "maximum loss limit," which is defined as the original loan amount ($4,000,000.00), plus accrued interest ($110,956.22) times eighty percent, which would equal $3,288,764.98.[13] Since USDA paid $2,908,534.42 ($3,111,200.00 to the Holders with a credit of $202,665.94 for the sale of the collateral), USDA therefore calculates the maximum amount that can be paid to BOM as $380,230.56 ($3,288,764.98 (maximum loss limit) − $2,908,534.42 (net loss)). Accordingly, BOM claims it is entitled to payment of $2,812,277.91, while USDA contends that it is only obligated to pay $380,230.66.

---

[8] [Doc. No. 36-1, pp. 6–7]; [Doc. No. 14-1, p. 4].
[9] [Doc. No. 14-3].
[10] [Doc. No. 20-10, p. 46]. $3,050,400.00 in principal and $60,801.00 in accrued interest.
[11] [Doc. No. 20-10, p. 46].
[12] [Doc. No. 14-4]; [Doc. No. 24-1, p. 5].
[13] [Doc. No. 36-1, p. 19].

After an unsuccessful mediation, BOM appealed to the USDA's National Appeals Division ("NAD").[14] The Administrative Judge held a hearing on August 5, 2024.[15] On September 30, 2024, the Administrative Judge found that USDA did not err in its determination that it only owed BOM $380,230.66.[16]

BOM then filed for a director review determination of the Administrative Judge's decision.[17] On December 9, 2024, Director Frank M. Wood found that the Administrative Judge's determination was supported by "substantial evidence," and therefore denied BOM's appeal.[18] On March 14, 2025, BOM filed the instant suit.

The issues have been briefed, and the Court is prepared to rule.

## II.   LAW AND ANALYSIS

### A.   Standard of Review

A court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant meets their initial burden of showing no genuine issue of material fact, "the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013) (citation modified). A fact is "material" when proof of its existence or nonexistence would affect the lawsuit's outcome under applicable law in

---

[14] [Id. at p. 17].
[15] [Doc. No. 24-2].
[16] [Doc. No. 14-7].
[17] [Doc. No. 14-1].
[18] [Id. at p. 5].

the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. And a dispute about a material fact is "genuine" only if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). But summary judgment is appropriate when the evidence is "merely colorable or is not significantly probative." *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012).

Moreover, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E & P USA Inc. v. Kerr–McGee Oil & Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013).

Finally—and importantly—there can be no genuine dispute as to a material fact when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof of trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

### B. Scope of Judicial Review Pursuant to 7 U.S.C. § 6991

Judicial review in this action is available pursuant to the provisions of the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994 (the "Act"). 7 U.S.C § 6991. The Act authorizes judicial review of a final determination in accordance with the standards outlined in the Administrative Procedure Act ("APA"), 5 U.S.C. § 701. 7 U.S.C. § 6999.

Pursuant to the APA, a court's review is limited to the administrative record and focuses on whether the agency action must be set aside under the standards established in 5 U.S.C. § 706. The APA further authorizes a reviewing court to set aside final agency action only if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" failed to comply with statutory, procedural, or constitutional requirements; or was "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A)–(E).

An agency decision is not arbitrary or capricious and must be upheld unless the record reflects "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Louisiana Env't Action Network v. U.S. E.P.A.*, 382 F.3d 575, 582 (5th Cir. 2004) (citing *Motor Vehicle Mfrs. Assn. v. State Farm Mut.*, 463 U.S. 29, 43 (1983)).

There is a strong presumption in favor of upholding agency decisions made within the scope of the agency's expertise. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 375–78 (1989). Additionally, if the agency's action is "reasonable and reasonably explained," its decision must be upheld. *Texas v. United States Env't Prot. Agency*, 132 F.4th 808, 839 (5th Cir. 2025). To satisfy the APA, an agency's factual determinations must be supported by "substantial evidence" in the administrative record. *Pierce v. Underwood*, 487 U.S. 552, 564 (1988). The phrase "substantial evidence" does not mean a considerable amount of evidence, but rather "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 565; *see also Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The standard of review is a narrow one, and the "reviewing court is not permitted to substitute its judgment for that of the [Agency]." *Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981).

### C. Analysis

USDA's payment obligation to BOM is determined by a review of the loan guarantee documents and the applicable regulations, which are quoted and discussed below.

#### 1. USDA Documents (Loan Note Guarantee and Lender's Agreement)

The Loan Note Guarantee states that USDA guarantees eighty percent of $4 million, which makes the guaranteed portion of the loan principal $3,200,000.[19] The pertinent part of the Loan Note Guarantee asserts:

---

[19] [Doc. No. 14-2, p. 1].

> In consideration of the making of the subject loan by the above named Lender, the United States of America, acting through the United States Department of Agriculture ("USDA"), pursuant to the Consolidated Farm and Rural Development Act (7 U.S.C. 1921 et seq), does hereby agree that in accordance with and subject to the conditions and requirements herein, it will pay to:
>> A. Any Holder 100 percent of any loss sustained by such Holder on the guaranteed portion and on interest due on such portion.
>> B. The Lender the **lesser** of paragraph 1 or 2 below:
>>> 1. Any loss sustained by such Lender on the guaranteed portion including:
>>>> a. Principal and interest indebtedness as evidenced by said notes or by assumption agreements, and
>>>> b. Principal and interest indebtedness on secured protective advances for protection and preservation of collateral made with USDA's authorization, including but not limited to, advances for taxes, annual assessments, any ground rents, and hazard or flood insurance premiums affecting the collateral, or
>>> 2. The guaranteed principal advanced to or assumed by the Borrower under said notes or assumption agreements and any interest due thereon. [20]

As defined in the Loan Note Guarantee, a "Holder" is "the person or organization ("investor") other than the Lender who owns all or part of the guaranteed portion of the loan with no servicing responsibilities."[21]

The "Lender" is the "person or organization making and servicing the loan."[22] In this case, the Bank of Montgomery, BOM's former name, was the Lender.[23]

---

[20] [Id. (emphasis added)].
[21] [Id.].
[22] [Id. at p. 2].
[23] [Id.].

Page **8** of **17**

Accordingly, BOM was the named Lender, and the six assignees of the guaranteed portion of the loan were the Holders. As a result, BOM oversaw the servicing of the entire loan and received all payments.[24] Moreover, paragraph six of the Loan Note Guarantee asserts that, "[p]rotective advances made by Lender pursuant to the regulations will be guaranteed against a percentage of loss to the same extent as provided in this Loan Note Guarantee notwithstanding the guaranteed portion of the loan that is held by another."[25] As for settlement, the document states that "[t]he amount due under this instrument will be determined and paid as provided in the applicable USDA regulations in effect on the date of settlement unless such regulations are in direct conflict with this agreement."[26]

The Lender's Agreement, however, permits BOM to retain or assign all or part of the guaranteed portion of the loan while requiring BOM to service the entire loan.[27] Relevant here, are several portions of the "Liquidation" provision of the Lender's Agreement. The first provides that when "USDA concurs with the Lender's conclusion [that a guaranteed loan must be liquidated or] concludes independently that liquidation is necessary, it will notify the lender" and:

> If the Lender does not purchase the guaranteed portion of the loan, USDA will be notified immediately in writing. USDA will then purchase the guaranteed portion of the loan from the Holder. If USDA holds any of the guaranteed portion, USDA will be paid first its pro rate share of the proceeds from liquidation of the collateral.[28]

---

[24] [Doc. No. 14-1, ¶¶ 2, 5].
[25] [Doc. No. 14-2, ¶ 6].
[26] [Id. at ¶ 13].
[27] [Doc. No. 14-3, p. 2].
[28] [Id. at p. 4].

Second, is the "Determination of Loss and Payment" section, which provides that:

> In all liquidation cases, final settlement will be made with the Lender after the collateral is liquidated.
> 1. Form RD 449-30, "Loan Note Guarantee Report of Loss," will be used for calculations of all estimated and final loss determinations. Estimated loss payments may be approved by USDA after the Lender has submitted a liquidation plan approved by USDA. Payments will be made in accordance with applicable USDA regulations.
>
> . . . .
>
> 3. . . . Upon receipt of the final accounting and report of loss, USDA may audit the account and will determine the final loss.[29]

Third, is the "Maximum amount of interest loss payment" section, which states that "[n]otwithstanding any other provisions of this agreement, the amount payable by USDA to the Lender cannot exceed the limits set forth in the Loan Note Guarantee."[30] Finally, there is the "Protective Advances" portion, which states that "[p]rotective advances must constitute an indebtedness of the Borrower to the Lender and be secured by the security instruments. USDA's written authorization is required for all protective advances in excess of $5,000."[31]

### 2. USDA Regulations (7 C.F.R. §§ 4279 and 4287)

The Program guarantees loans made by private lenders to rural businesses "improve, develop, or finance business, industry, and employment and improve the

---

[29] [Id. at p. 5].
[30] [Id.].
[31] [Id.].

economic and environmental climate in rural communities." 7 C.F.R. § 4279.101(b). After closure of the loan under the Program, there are essentially two options a lender may have with respect to the guaranteed portion of the loan debt: (1) the lender may "retain the entire loan," or (2) it may "sell all or a part of the guaranteed portion of the loan [to a holder] on the secondary market. If the latter option is chosen, it entitles the holder of the loan to "succeed to all rights of the lender under the Loan Note Guarantee to the extent of the portion purchased." 7 C.F.R. §§ 4279.75, 4279.72(b). Following default and liquidation of available collateral, the guaranteed lender submits a report of loss using the Agency's "[r]eport of loss form," which, here, is Form RD 449-30. 7 C.F.R. § 4287.158(a).

Protective advances increase the outstanding debt on guaranteed loans. To eliminate any uncertainty regarding USDA's loss exposure when such advances are made, the Program's protective–advance regulations have long included "maximum loss" provisions. Particularly, 7 C.F.R. § 4287.156 states that "[a] protective advance claim will be paid only at the time of the final report of loss payment." Further, "[t]he maximum loss to be paid by the Agency will never exceed the original loan amount plus accrued interest times the percentage of guarantee regardless of any protective advances made." 7 C.F.R. § 4287.156(a).

The loan at issue in this case originated in 2012. It entered default in 2016, at which time the Holders were paid. BOM thereafter made protective advances from 2016 through 2022 and submitted its final loss claims in 2023. Because the applicable regulations uniformly limit USDA's maximum liability for protective advances to the

original loan amount plus accrued interest, multiplied by the guaranteed percentage, the regulatory framework supports USDA's position.

Despite the regulatory support for USDA's position, BOM contends that the Loan Note Guarantee supersedes the regulations, and, in any event, the two are in conflict.[32] BOM points to paragraph six of the Loan Note Guarantee, which states, "Protective Advances made by Lender pursuant to the regulations will be guaranteed against a percentage of loss to the same extent as provided in this Loan Note Guarantee notwithstanding the guaranteed portion of the loan that is held by another."[33] BOM contends that this language—specifically, the phrase "notwithstanding the guaranteed portions of the loan that is held by another"—establishes that USDA is responsible for eighty percent of all protective advances made by BOM, even if doing so results in USDA's liability exceeding the original loan amount plus accrued interest.[34]

However, a complete reading of the Loan Note Guarantee demonstrates that the language contained throughout is consistent with, rather than in conflict with, the regulations. Specifically, Section B of the Loan Note Guarantee clearly states that the USDA will pay to the Lender, the **lesser** of: (1) any loss sustained by the Lender including principal, interest, and the secured protective advances, or (2) the guaranteed principal advanced to or assumed by the Borrower under said notes or assumption agreements and any interest due thereon.[35]

---

[32] [Doc. No. 24-1, pp. 6–8].
[33] [Doc. No. 14-2, ¶ 6]; [Doc. No. 24-1, pp. 8–9].
[34] [Doc. No. 24-1, p. 11].
[35] [Doc. No. 14-2, p. 1].

The "lesser" amount would be Section B(2) because if eighty percent of the protective advances were added into the total ($3,515,347.39 x 80% = $2,812,277.91), USDA would end up paying a total of $5,923,477.91.[36] This amount is significantly more than the B(1), which would be the guaranteed principal advanced to the Borrower plus accrued interest. Accordingly, the terms of the Loan Note Guarantee limit USDA's maximum payment to eighty percent of the guaranteed principal advanced to the borrower, plus accrued interest.

Additionally, although USDA approved each protective advance before BOM made the payment, USDA approval letters expressly stated that, regardless of the amount of protective advances paid, USDA's maximum payable loss could not exceed the regulatory cap on allowable losses.[37]

Like the Administrative Judge and the director's review, this Court finds the Loan Note Guarantee, the Lender's Agreement, and the applicable regulations support all prior conclusions that USDA was only required to pay the "maximum loss limit" of $3,288,764.98.

### 3. Form RD 449-30

BOM's second argument is that BOM used USDA's form, titled Form RD 449-30, which showed BOM was entitled to eighty percent of the protective advances, and USDA's audit and changing of Form RD 449-30 was arbitrary and capricious under

---

[36] $3,111,200.00 (paid to the Holders) and $2,812,277.91 (paid to BOM for protective advances).
[37] [Doc. No. 20-7, p. 55].

5 U.S.C. § 706(2)(A).[38] Additionally, BOM argues that it should be entitled to the amount Form RD 449-30 calculated.[39]

The Form RD 499-30 originally calculated the balance due to BOM as $2,812,277.91.[40] However, USDA changed the form to reflect the maximum loss limit, which showed that BOM was due $380,230.66.[41] BOM maintains that USDA should be bound by the amount that Form RD 449-30 initially calculated, before USDA's manipulation.[42] The Court disagrees.

Agency forms are not rules or regulations and do not carry the force of law. *Farrell v. Tillerson*, 315 F. Supp 3d 47, 67 (D.D.C. 2018). Although Form RD 449-30 is required to be filled out to determine the final loss and payment, the Lender's Agreement allows USDA to "audit the account" to determine the payment due to the Lender.[43] Because USDA is authorized to audit the figures reported in Form RD 449-30, the calculation on the form was not intended to serve as the final loss determination. As a result, USDA's changes to the form cannot be considered arbitrary or capricious.

### 4. Setoff

BOM's final argument is that the setoff by USDA of the amount USDA paid to the Holders ($3,111,200) was improper.[44] As discussed previously, in early 2016, USDA paid the sum of $3,111,200 to purchase the notes of the Holders who had been

---

[38] [Doc. No. 24-1, p. 11].
[39] [Id. at p. 6].
[40] [Doc. No. 14-4].
[41] [Doc. No. 14-5].
[42] [Doc. No. 24-1, p. 11].
[43] [Doc. No. 14-3, p. 5].
[44] [Doc. No. 24-1, p. 13].

assigned the guaranteed portion of the note. The $202,665.94 received from the sale of the collateral was credited against the $3,111,200 paid, resulting in a net loss to USDA of $2,908,534.06 BOM further contends the Administrative Judge abused his discretion in raising the issue of setoff at the hearing.[45] This Court does not agree with either argument.

During the August 5, 2024, administrative hearing, the Administrative Judge asked the litigants below,

> And, I mean, the – the primary point of dispute here -- the primary point of dispute here is, to me, very clearly, what do you do with the amount of money the Agency spent to repurchase the notes from the holders? That's very clear. I understand how the Agency used that. Mr. Faircloth, what is the Appellant saying about what should be done with that? Just totally ignore how much the Agency paid to – in calculating the amount owed for protective advances to the Appellant, is the Appellant saying that the Agency should just ignore how much it paid to repurchase those notes?[46]

All the administrative records, including the Loan Note Guarantee,[47] the Lender's Agreement,[48] and the Assignment Guarantee Agreements,[49] included setoff provisions.

The provisions in each of the documents clearly grant USDA the right to setoff the amounts it paid to purchase the Holders' portion of the loan against any amount owed to BOM. The Administrative Judge did not raise an unknown affirmative defense on USDA's behalf. Rather, throughout the proceedings, USDA consistently

---

[45] [Id. at p. 16].
[46] [Doc. No. 24-2, p. 79].
[47] [Doc. No. 14-2, ¶ 9].
[48] [Doc. No. 14-3, p. 4].
[49] [Doc. No. 14-6, ¶ 9].

maintained that it could not pay BOM more than the "maximum loss limit," which necessarily requires crediting the amounts paid to the Holders. USDA asserted its entitlement to this credit throughout the proceeding. Accordingly, the claimed setoff was no surprise to BOM. Thus, the Administrative Judge did not abuse his discretion in questioning the parties about an issue that was already before that court.

With respect to the asserted setoff defense, BOM contends that setoff is inapplicable because it is a legal remedy used to enforce a right or satisfy an unmet obligation.[50] Regardless of whether the adjustment is characterized as a setoff or a credit, the Loan Note Guarantee, the Lender's Agreement, and the Assignment Guarantee Agreements expressly provide that USDA's purchase of the assigned notes from the Holders did not waive any rights the Holders possessed against BOM. Those documents also allowed BOM to purchase the amounts assigned to the Holders. Had BOM exercised that option, it would be in the same position. In any event, for the reasons previously discussed, USDA could not be responsible for paying BOM more than its maximum loss limit.

Ultimately, regardless of who paid the Holders, USDA was never obligated to pay BOM more than the original loan amount, plus accrued interest, multiplied by the guaranteed percentage, the maximum loss limit. Read as a whole, the loan documents make clear that the amounts USDA paid to the Holders were included in calculating that maximum loss limit. Thus, the Court finds that no genuine issues of material fact exist, and USDA is entitled to judgment as a matter of law in that the

---

[50] [Doc. No. 24-1, p. 13].

maximum amount that can be paid to BOM is $380,230.56 ($3,288,764.98 (maximum loss limit) − $2,908,534.42 (net loss)).

### III. CONCLUSION

Accordingly, for the reasons set forth herein, the Motion filed by USDA [Doc. No. 36] is **GRANTED** and the Motion for Summary Judgment filed by BOM [Doc. No. 24] is **DENIED**.

**IT IS ORDERED, ADJUDGED, AND DECREED** that all claims asserted by BOM against USDA are **DISMISSED WITH PREJUDICE**.

MONROE, LOUISIANA, this 17th day of February 2026.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE